UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

HUI ALTMAN,                                     :
                                                :
                          Plaintiff,            :          13-cv-3253 (NSR)
            -against-                           :
                                                :          OPINION AND ORDER
NEW ROCHELLE PUBLIC SCHOOL DISTRICT, :
MR. KALOHIFAR (KALOHIFAR),                      :
MR. ORGANISCIAK and MENDEZ,                     :
                          Defendants.           :
----------------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge:

Plaintiff Hui Altman, a school teacher by trade, commenced the instant action *pro se*

against her former employer, the New Rochelle Public School District ("District"), former

supervisor Juan Mendez ("Mendez"), the Superintendent of the District, Richard Organisciak

("Organisciak"), and the Assistant to the Superintendent for Human Resources, Reza Kolahifar

("Kolahifar")[1] (collectively, "Defendants"), seeking monetary damages for unlawful termination.

In her complaint, Plaintiff alleges that Defendants discriminated against her based on her age in

violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, and

based on her national origin in violation of Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. §§ 2000e to 2000e-17. Plaintiff also alleges wrongful termination in violation

of Article 23 of the Universal Declaration of Human Rights.

Defendants now move to dismiss the complaint, pursuant to Federal Rule of Civil

Procedure 12(b)(4) and (b)(6), for judgment on the pleadings pursuant to Rule 12(c), and/or to

convert their 12(b)(6) motion to dismiss into a motion for summary judgment pursuant to Rule

---

[1] It appears the caption misspells this defendant's name, as a letter he wrote to Plaintiff and other documents written by District personnel spell his name "Kolahifar" instead of "Kalohifar." (*See, e.g.,* Savoiardo Decl. Exs. H, M, N, Q, U).



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6|19|2014

12(d), asserting there is no genuine dispute of material fact and Defendants are entitled to judgment on Plaintiff's discrimination claims as a matter of law.  Defendants served upon Plaintiff a "Notice to Pro Se Litigant Who Opposes a Rule 12 Motion Supported By Matters Outside the Pleadings," along with the full text of Federal Rule of Civil Procedure 56, as required by Local Civil Rule 12.1.  Defendants aver that Defendant District was never served with process, that Plaintiff cannot make out a prima facie case of either age or national origin discrimination, that the Complaint fails to state a claim due to after-acquired evidence, and that Plaintiff cannot show Defendants' stated reasons for terminating her employment are pretext for discrimination.  To the extent Defendants' motion relies upon materials outside the pleadings, the motion is treated as a motion for summary judgment.  For the following reasons, Defendants' motion is granted in part and denied in part.

## I. THE FACTS

The facts are gleaned from the Complaint, affidavits, and exhibits submitted with this motion, and are not in dispute except where noted.

Plaintiff, born in 1958, is a native of China.  On or about May 20, 2010, while employed as a part-time Mandarin Chinese teacher in a middle school in White Plains, New York, Plaintiff applied for a full-time Mandarin Chinese teaching position in the District's schools by submitting a cover letter and resume.  On June 25, 2010, she submitted a formal application to the District.  In the application and on her resume, Plaintiff listed previous part-time positions with Ossining High School and the White Plains position, and previous full-time positions teaching English or English as a Second Language ("ESL") at Monroe College, Westchester Community College, and the New York City public schools.  On this formal application, Plaintiff represented that she had never been fired from any employment or denied tenure or

reappointment.  Mendez, who supervises the District's World Languages Department, affirms that he recommended Plaintiff for the Mandarin teaching position with the District.  On July 29, 2010, the District's now-retired assistant superintendent for human resources sent Plaintiff a letter informing her that she would be recommended for the position, "subject to the approval of the Superintendent of Schools [Organisciak] and the Board of Education."  (Savoiardo Decl. Ex. G.)  Plaintiff's appointment was to be effective September 1, 2010, through September 1, 2013, during which time she would be a probationary teacher—i.e., she would not be tenured for those three years.  Plaintiff accepted the position.  She was approximately 52 years old.

Plaintiff's employment with the District involved teaching Mandarin at two elementary schools and one middle school.  The Complaint alleges that Mendez, Plaintiff's supervisor, made remarks during her employment that evince age discrimination.  For instance, he allegedly told Plaintiff that, since the other Chinese teachers were "very young and ha[d] a lot of fresh/new ideas of teaching," Plaintiff should "go to their classes to learn some new teaching methods from them."  (Compl. at 6.)  Plaintiff's testimony at a 50-h hearing corroborates this allegation, as she stated that Mendez told her the other Chinese teachers "just graduated from NYU," were "very fresh," had "new knowledge," and Plaintiff "should learn from them."  (Savoiardo Decl. Ex. D, at 64:7-9.)  Mendez also allegedly suggested to Plaintiff that she should hold a Chinese New Year celebration at her house because the other Chinese teachers "are young and don't have a family here in the U.S."  (Compl. at 6.)

Mendez, as Plaintiff's supervisor, conducted both formal and informal classroom observations of Plaintiff.  He affirms that he provided support and guidance for the professional development of teachers within his department, including Plaintiff.  He avers that he conducted three formal classroom observations each of the two years Plaintiff was employed and provided

her copies of the performance reviews with his written comments.  In each review, Mendez wrote a description of class activities followed by comments and recommendations for improvement.  Generally, the reviews contained both positive and negative feedback.  Plaintiff and Mendez signed all except the final formal review.

In the review of an October 20, 2010, middle school Mandarin 1A class, Mendez commented that "Ms. Altman's warm personality contributes to a comfortable setting in which students feel comfortable learning and participating in the class," "she has shown to be a caring teacher who has much to offer her pupils," and she "demonstrates knowledge of the target language."  (Mendez Aff. Ex. A, at 2–3.)  In the same review, however, Mendez wrote that the "lesson was not well organized or suitable in terms of appropriateness and readiness for a Mandarin 1A class," that the warm-up activity "was a passive exercise with vague instructions not conducive to language learning," that Plaintiff should "[c]hange seating arrangements to separate students who distract each other," and that Plaintiff should "be sure to use closure and assess student learning" at the end of a lesson.  (*Id.* at 2.)  Mendez also recommended that Plaintiff meet with another teacher, Ms. Lumin Huang, "at least once a week to maintain proper scope and sequence of the Mandarin 1A curriculum . . . ."  (*Id.*)  Plaintiff testified that Ms. Huang was in her twenties at the time.  (Savoiardo Decl. Ex. D, at 62:4-9.)

The review of a January 26, 2011, kindergarten class was entirely positive.  Mendez described the lesson as "well structured and . . . suitable in terms of appropriateness, readiness, and content . . . ."  (Mendez Aff. Ex. B, at 2.)  He also wrote that "transitions from activity to activity served to keep her students focused on the interactive exercises," and that Plaintiff "was addressing [students] in Mandarin and encouraging them to use the language throughout the lesson."  (*Id.*)

The review of an April 14, 2011, fourth grade class was again mixed.  Mendez reiterated that Plaintiff's "transitions from activity to activity served to keep her students focused," that she "was addressing [students] in Mandarin and encouraging them to use the language throughout the lesson," and that the lesson was "suitable in appropriateness, readiness, and content" for the class.  (Mendez Aff. Ex. C, at 2.)  However, Mendez commented that the "lesson did not seem to have a definite structure and it felt as if it was put together in the spur of the moment."  (*Id.*)  He noted, among other things, that Plaintiff did not present written forms of the language to connect with the sounds and that exercises "did not transition well and . . . did not seem to have a connection."  (*Id.*)  Mendez then prepared a "Summative" on April 15, 2011, noting Plaintiff's commitment "to continuing with her professional growth."  (Mendez Aff. Ex. D.)  At that time, he recommended Plaintiff for a second year of probationary service.

Mendez again observed Plaintiff during the second year of her employment.  In his review of an October 19, 2011, fourth grade class, Mendez commented, as before, that Plaintiff "was addressing [students] in Mandarin and encouraging them to use the language throughout the lesson."  (Mendez Aff. Ex. E, at 2.)  However, he also wrote that Plaintiff needed "significant improvement" in the areas of "Pedagogical Preparation and Knowledge of Student Development."  (*Id.*)  He noted that "the problem with the lesson was . . . the lack of structure of the lesson itself," as it "did not provide a framework for her students and contributed to some of the off task behavior and restlessness they showed."  (*Id.*)  Mendez then instructed Plaintiff to "utilize [an] attached lesson format to help develop [her] lessons."  (*Id.*)

In the review of a December 15, 2011, fourth grade class, Mendez reiterated the positive comment that Plaintiff "was addressing [students] in Mandarin and encouraging them to use the language throughout the lesson."  (Mendez Aff. Ex. F, at 2.)  He also noted that Plaintiff had

"listened to some of our recommendations, . . . had a written lesson plan . . . and timed her activities providing her students with a structured lesson." (*Id.*)  He commented further that "[t]he lesson was suitable in terms of appropriateness and readiness for a Mandarin grade 4th class." (*Id.*)  Other positive comments included that Plaintiff's "oral and written expression[s] were clear and expressive, the students were all engaged[,] . . . [c]lassroom routines and procedures are clear and function smoothly[, and] students are aware of, and attentive to, what is expected of them." (*Id.* at 3.)  However, Mendez was not satisfied that "most of the activities required little interaction amongst students and were mostly dominated by [Plaintiff]." (*Id.* at 2.) He wrote that "the pair activity presented to the class was not appropriate and did not lend itself to student interaction." (*Id.*)  He suggested an alternative pair activity and commented that it was "pivotal" for Plaintiff to explain each student's role in cooperative activities.  (*Id.*)  Finally, Mendez apparently attached two documents to aid Plaintiff in planning cooperative learning activities.  (*Id.* at 2, 4.)

In the review of a March 22, 2012, fourth grade class, Mendez commented that Plaintiff "made some progress in her lesson development and implementation," but that "her lack of consistency and thoroughness continues to hinder her professional growth." (Mendez Aff. Ex. G, at 2.)  He found the lesson "not suitable in terms of readiness and content" for the class.  (*Id.*) He noted that "activities did not connect and were left undone," that Plaintiff "did not provide closure for the exercises," and that Plaintiff "did not spend any time breaking down for the class the vocabulary or phrases being used." (*Id.*)  According to Mendez, Plaintiff "did not get to explain . . . the tones of the characters or explain the pinyin form of it." (*Id.*)  He wrote further:

> On this specific occasion, the lesson seemed to be geared only for those students
> who had a better grasp of the language.  I observed, as a group sitting in the back
> seemed completely lost as the exercises were too much for them, and as they

> became desperate and went off task, [Plaintiff's] response was not the most
> appropriate as she verbally lashed out at some of them in front of their peers. In
> my observation, it was obvious that they were overwhelmed with a task beyond
> their proficiency. It is pivotal that [Plaintiff] create[] lessons that are
> differentiated in order to assure that all of levels of proficiency [sic] in her class
> are being addressed.

(*Id.*) Mendez ended by saying, "[k]nowing [Plaintiff], I am certain that she will continue working on improving her instructional time." (*Id.*) Neither Mendez nor Plaintiff signed this written review. (*Id.* at 1.) Plaintiff testified that she never received this written evaluation, but did meet with Mendez after the observation and had a "difficult argument" about the problems Mendez purportedly observed. (Savoiardo Decl. Ex. D, at 78:16-79:5, 80:2-8.)

Mendez affirms that a few weeks prior to the March 22, 2012, observation, he conducted an informal observation of Plaintiff's fourth grade class. (Mendez Aff. ¶ 17.) He purportedly observed that (a) Plaintiff had all the minority students sitting in the back of the room and (b) Plaintiff was only interacting the two or three students in the front who were proficient enough to keep up with her lesson while ignoring the rest of the class. (*Id.*) He states that when an African-American girl raised her hand and said she did not understand Plaintiff's instructions, Plaintiff said the girl never understood and then continued with the students in the front. (*Id.* ¶ 18.) Mendez purportedly expressed to Plaintiff his concerns that the lesson was not level-appropriate, that the lesson "did not incorporate activities to teach all the student levels," and that the comment to the African-American girl was inappropriate. (*Id.* ¶ 19.) Mendez claims further that Plaintiff stated the girl who raised her hand was a special education student who never understood what was going on. (*Id.*)

On March 23, 2012, Kolahifar wrote to Plaintiff asking her to meet with him and Mendez at his office on March 29, 2012. On March 26, 2012, Mendez apparently prepared an annual

teacher's evaluation report in which he did not recommend Plaintiff for a continuation of

probationary service.  Neither he nor Plaintiff signed the document.  Mendez attached to the

annual evaluation the comments sections of the six formal observations, and a "Summative"

dated March 26, 2012, which states:

> At this juncture, formal and informal visits to [Plaintiff]'s classroom have
> demonstrated a series of pedagogical areas that are in need of remediation.  Lack
> of student-centered challenging activities and insufficiently prepared lessons have
> compromised, at times, adequate instruction for her pupils.  These and other
> issues have been brought to [Plaintiff]'s attention during post-observation and
> other individual conferences.  [Plaintiff] has been provided with support to assist
> her on lesson plan development and classroom management.  During the last two
> years I have met with [Plaintiff], assisting her in lesson planning.
> To date, [Plaintiff] has demonstrated no significant longitudinal
> professional growth.  Therefore, I do not recommend the continuance of
> probationary service for [Plaintiff].

(Mendez Aff. Ex. I, at 4.)  Plaintiff testified that she had never seen this Summative before her

50-h hearing.  (Savoiardo Decl. Ex. D, at 82:16-83:13.)  Mendez claims that Plaintiff refused to

sign it.  (Mendez Aff. ¶ 22.)

On March 29, 2012, Plaintiff appeared in Kolahifar's office to meet Kolahifar and

Mendez as requested.  According to Plaintiff's 50-h hearing testimony, Kolahifar told Plaintiff

they were not going to give her tenure and that she was terminated.  (Savoiardo Decl. Ex. D, at

85:13-17.)  When Plaintiff asked Kolahifar why, he said to "ask Juan Mendez"; when she asked

Mendez, he said, "You don't prepare for your class," an assertion which Plaintiff contested.  (*Id.*

at 85:17-86:3.)[2]  Plaintiff asked Mendez how he could do this to her, since she had a mortgage

---

[2] Plaintiff's affidavit, purportedly of her contemporaneous journal entries, corroborates the substance of this portion
of the conversation.  (Pl.'s Ex. C, at 1–2.)  Although Defendants assert her journal entries are entirely hearsay and do
not fit within any exception, the Court liberally treats the document—submitted by a party proceeding *pro se*—as an
affidavit, and considers any comments attributed to Plaintiff and any Defendant.  *See* Fed. R. Evid. 801(d)(2)(A).  In
any event, Plaintiff's version of events appears in her testimony elicited at her 50-h hearing, which Defendants
themselves proffer as evidence.  (Savoiardo Decl. Ex. D.)

and a child in college.  (Pl.'s Ex. C., at 2; Mendez Aff. ¶ 28.).  At some point, Plaintiff told

Mendez he was inconsistent, as he would say she was an "upstanding teacher" and a "great

teacher" but he would also "say bad things about" her.  (Pl.'s Ex. C, at 2; Savoiardo Decl. Ex. D,

at 89:6-10.)  Also at the meeting, Plaintiff received a letter from Organisciak stating that he

intended "to recommend to the Board of Education . . . that [her] employment be terminated and

[her] appointment with the [District] discontinued . . . effective June 30, 2012."  (Savoiardo

Decl. Ex. I.)  According to Plaintiff, Kolahifar stated that he wanted Plaintiff to be professional

and finish the job until the last day of school.  (Pl.'s Ex. C, at 2; Savoiardo Decl. Ex. D, at 88:19-

89:4.)  She asserts that she exclaimed to Mendez, "If anything happened to my career, you are

responsible!  You are a sick man!  I hate you!"  (Pl.'s Ex. C, at 2.)  Mendez affirms that she said,

"in sum and substance, 'when I kill myself, it will be on your conscience' while making a

slashing motion with her finger across her throat."  (Mendez Aff. ¶ 28.)

     Plaintiff left the meeting and, after attempting to meet with another Assistant

Superintendent, proceeded to the school where she was to teach her next class.  She ended up

speaking with the principal in his office.  (Pl.'s Ex. C, at 3-4; Savoiardo Decl. Ex. D, at 96:12-

97:19.)  While there, police arrived and said someone at the District's office called and reported

that Plaintiff had said she wanted to kill herself.  Police apparently threatened to handcuff

Plaintiff if she did not agree to go to the hospital, while Plaintiff insisted she did not need to go

and instead wanted to talk to her husband.  Plaintiff testified that when she called her husband,

police grabbed her phone and spoke with Plaintiff's husband, then would not let Plaintiff speak

with him.  According to the police report, eight officers and an ambulance responded to the call,

and Kolahifar told police that Plaintiff had become "emotionally upset and stated 'when I kill

myself it will be your fault!' . . . [and had] made several remarks about harming herself."

(Savoiardo Decl. Ex. J, at 1, 4.)  EMT workers stated that Plaintiff's "abnormal blood sugar level

. . . and blood pressure medication . . . was a possible cause of [Plaintiff's] behavior."  (*Id.* at 4.)

Plaintiff proceeded to the hospital voluntarily in an ambulance and was released soon thereafter.[3]

Plaintiff set up a meeting with Organisciak and Kolahifar on April 2, 2012.  She

apparently brought documentation from a physician stating she was fit to return to work.

Plaintiff testified that she asked Organisciak to allow her to finish the third year on her contract,

but that Organisciak was very nasty to her and said, "You don't tell me what to do.  You're

terminated."  (Savoiardo Decl. Ex. D, at 110:3-11.)  Plaintiff tried to give Organisciak some

references, but he said he was from the city (i.e., of New York) and knew what had transpired

there[4] through his connections but declined to elaborate.  Plaintiff asked whether Organisciak

could find her a job through his connections, and Organisciak allegedly responded, "Why don't

you work in Chinatown?"  (*Id.* at 112:2-7.)  Plaintiff stated this suggestion made no sense

because she lived in Westchester County and had to care for her husband, who has Parkinson's

disease.  Kolahifar then stated, "Maybe it's better [that you] work for your own people."  (*Id.* at

112:18-19; *cf.* Pl's Ex. C, at 5 (quoting Oranisciak as saying, "why don't you go to Chinatown to

teach?" and Kolahifar as saying, "[y]ou'd [be] better off working there for your own people").)

Defendants proffer no evidence to refute Plaintiff's account of this meeting.

On April 5, 2012, Organisciak wrote Plaintiff a letter informing her that she was being

---

[3] The incident was the subject of a local internet blog post, (Savoiardo Decl. Ex. L), as well as a state court proceeding for defamation in which summary judgment in favor of Kolahifar and the District was recently denied, *see Altman v. New Rochelle Pub. Sch. Dist.*, No. 51159/2013, Slip Op. at 3 (Sup. Ct. Westchester Cnty. Mar. 25, 2014).  The state court action is distinct from the instant discrimination action.

[4] This was apparently regarding the termination of and denial of tenure to Plaintiff in 2004 by the New York City Department of Education, (Savoiardo Decl. Ex. Z (Decision in Article 78 Proceeding)), and the subsequent discrimination action she brought against the New York City Department of Education in the Southern District of New York, (Savoiardo Decl. Ex. AA (Decision in Discrimination Action)).  Organisciak proffers no affidavit or other testimony explaining this reference to New York City.

placed on administrative leave with pay, effective immediately.  He instructed her to "refrain from any communication with parents or students" and forbade her from entering school buildings without his or Kolahifar's permission.  (Pl.'s Ex. N.)  He also instructed her to return any school-owned property to him by April 16, 2012.

On April 16, 2012, Plaintiff arranged to meet Kolahifar at a school to retrieve her belongings.  Kolahifar handed Plaintiff another letter from Organisciak informing her that her effective date of termination would be June 1, 2012, instead of June 30, 2012, as previously stated in the March 29, 2012, letter.  This change was purportedly due to "information about [Plaintiff's] termination from the Croton-Harmon School District," (Savoiardo Decl. Ex. M), a job which Plaintiff did not include on her resume or job application.  On April 17, 2012, Organisciak reported Plaintiff's failure to include the Croton-Harmon job on her application and resume to the State Education Department Teacher Discipline Unit, raising a question as to Plaintiff's moral character.  (Savoiardo Decl. Ex. N.)  Defendants proffer minutes of a Croton-Harmon School District board meeting held February 22, 2010, wherein the board voted to terminate Plaintiff's employment as a Mandarin teacher effective immediately.  (Savoiardo Decl. Ex. X.)  Plaintiff testified that she in fact resigned from the position because the other Chinese teacher was uncooperative, (Savoiardo Decl. Ex. D, at 29:23-31:2, 40:6-7), and she proffers a copy of her letter of resignation dated February 22, 2010, (Pl.'s Ex. B.)  On April 25, 2012, Plaintiff sent a letter to the District's board of education explaining that she resigned the Croton-Harmon job and asking the board to adhere to the original termination date of June 30, 2012, instead of the new June 1, 2012, date.

On May 2, 2012, the District's board sent Plaintiff notification that her employment was to be terminated "as of the close of business June 1, 2012."  (Savoiardo Decl. Ex. P.)  This

decision, by majority vote on May 1, 2012, was based "upon the recommendation of the Superintendent of Schools," Defendant Organisciak.  (*Id.*)  On June 8 and June 11, 2012, Plaintiff filed notices of claim against the District for back pay and defamation.  She also appears to have filed an EEOC charge of discrimination about the same time.

The Complaint alleges Plaintiff was replaced by a younger teacher.  Defendants assert that Plaintiff's position was filled by someone older than Plaintiff.  Defendants proffer a letter and resume submitted June 13, 2012, from the replacement, as well as a formal application submitted July 10, 2012.  (Savoiardo Decl. Exs. Q, R.)  The replacement appears to be from Taiwan, originally.  The driver's license which Defendants proffer does not legibly show the replacement's date of birth, but her employment eligibility form shows a birth year of 1956.  (Savoiardo Decl. Ex. W.)  On August 7, 2012, the District's board of education approved hiring the replacement teacher.  (Savoiardo Decl. Ex. U.)  On November 12, 2012, the District examined Plaintiff at a 50-h hearing as required for her state law claims.

## II. SUMMARY JUDGMENT STANDARD

As Defendants present matters outside the pleadings which the Court does not exclude, and as Plaintiff was timely apprised of the possibility that this motion could be treated as a motion for summary judgment, *see* Fed. R. Civ. P. 12(d), the Court hereby treats the motion as one for summary judgment.  Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of

demonstrating the absence of any genuine dispute or issue[5] of material fact by pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). Once the moving party has fulfilled its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013); *Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)). Courts must also construe a *pro se* litigant's supporting papers liberally, "interpret[ing] them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (citing *Mikinberg v. Baltic S.S. Co.*, 988 F.2d 327, 330 (2d Cir. 1993), *overruled in part on other grounds*, *Norfolk S. Ry. v. James N. Kirby, PTY Ltd.*, 543 U.S.

---

[5] The 2010 amendment to the Rule retained the summary judgment standard of former subdivision (c), but replaced "issue" with "dispute" because the term "better reflects the focus of a summary judgment determination." Fed. R. Civ. P. 56 advisory committee's note on 2010 amendments. Thus, the terms are used interchangeably.

14, 30 (2004)); *accord Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)).  In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact."), nor is it to determine a witness's credibility, *Anderson*, 477 U.S. at 249. Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250.

"[S]ummary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *see also ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 150 (2d Cir. 2007) ("[I]ntent is always a subjective matter of inference and thus rarely amenable to summary judgment." (quoting *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980))).  However, "[s]tatements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998))).

14

## III. AGE DISCRIMINATION

In her Complaint, Plaintiff asserts her ADEA discrimination claim against the District, Organisciak, and Mendez.  Defendants assert that Plaintiff has insufficient evidence to support her allegations that Defendants intentionally discriminated against her because of her age.  The ADEA protects employees who are at least 40 years old from adverse employment actions.  29 U.S.C. § 631(a).  Under the ADEA, it is unlawful for an employer, *inter alia*, "to discharge any individual or otherwise to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's age."  *Id.* § 623(a)(1).

To establish a *prima facie* case for age discrimination, a plaintiff must demonstrate "(1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that the action occurred under circumstances giving rise to an inference of discrimination."  *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012).  The Second Circuit has characterized the burden of establishing a *prima facie* case in age discrimination cases as "minimal" and "de minimis."  *Berube v. A&P*, 348 F. App'x 684, 686 (2d Cir. 2009) (citing *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001)).  Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant, who must offer "a legitimate, nondiscriminatory rationale for its actions."  *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000)).  If the defendant offers such a rationale, the burden then shifts to the plaintiff to prove that the defendant's rationale is a pretext for discrimination.  *McDonnell Douglas*, 411 U.S. at 804.  To raise a triable issue of fact concerning pretext at the summary judgment stage,

"the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based . . . on discrimination." *Terry*, 336 F.3d at 138 (quoting *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)); *cf. St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.").

The ADEA does not allow for mixed-motive discrimination claims. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009). Thus, "a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Id.* at 176; *contra* 42 U.S.C. § 2000e-2(m) (Title VII plaintiff establishes discrimination if she demonstrates "that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice").

Defendants contend that Plaintiff cannot demonstrate either that she was qualified for the position or that the circumstances of her termination give rise to an inference of discrimination, the second and fourth elements of the *prima facie* case. As to Plaintiff's lack of qualifications, Defendants make no argument in their brief as to why Plaintiff was unqualified. Viewing the evidence in the light most favorable to Plaintiff, she is not only a native Mandarin speaker, but she also taught Mandarin in schools for a number of years and in 2009 completed a teachers' training program provided by Nanjing University for teaching Chinese. Thus, Plaintiff has proffered sufficient evidence to demonstrate she is qualified for the position.

As to drawing an inference of discrimination, "an ADEA plaintiff who is replaced by a significantly younger worker must offer some evidence of a defendant's knowledge as to the significant age discrepancy to support a *prima facie* inference of discriminatory intent." *Bucalo*,

16

691 F.3d at 130 (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 90 (2d Cir. 2005)).  Here, there is no genuine dispute of material fact as to who replaced Plaintiff.  Although Plaintiff alleges she was replaced by a significantly younger teacher in April 2012 and argues that the District subsequently hired the older replacement as a cover up, (*see* Compl. at 6; Pl.'s Br. 8), she proffers absolutely no evidence that the District hired a much younger teacher.  Plaintiff's assertion thus appears conclusory and speculative, and does not support an inference of discrimination.  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir 1999); *cf. FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010).

Defendants also argue that the remarks Mendez allegedly made encouraging Plaintiff to learn from the young teachers who had fresh, new ideas are insufficient to demonstrate an inference of discrimination because the alleged statements were unrelated to Plaintiff's termination.  Under Second Circuit precedent, "stray remarks . . . made by a decisionmaker[] do not constitute sufficient evidence to make out a case of employment discrimination . . . *without more*."  *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998).  A plaintiff must properly present "other indicia of discrimination" in order for the remarks to no longer be deemed stray. *Id.*  Here, the alleged discriminatory remarks were not made in connection with or even close in time to Plaintiff's termination.  Moreover, other than Plaintiff's conclusory statements, she presents no other evidence regarding discriminatory animus based on her age.  Thus, Plaintiff is unable to establish a *prima facie* case of age discrimination.

Even had Plaintiff demonstrated a *prima facie* case, Defendants have proffered a legitimate, non-discriminatory rationale for Plaintiff's termination, namely, Plaintiff's unsatisfactory work evaluations.  Plaintiff proffers no evidence other than the stray remarks to support her contention that the alleged legitimate reason for termination was pretext for age

17

discrimination. *McDonnell Douglas*, 411 U.S. at 804. Accordingly, Defendants' motion seeking summary judgment dismissal of Plaintiff's ADEA age discrimination claim must be granted.

## IV. NATIONAL ORIGIN DISCRIMINATION

Plaintiff asserts her Title VII discrimination claim against the District, Organisciak, and Kolahifar. Defendants assert that Plaintiff has insufficient evidence to support her claim that Defendants intentionally discriminated against her because of her national origin. As with age discrimination, the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies where there is circumstantial evidence of discrimination. Thus, a plaintiff must first establish a *prima facie* case of discrimination. *Id.* at 802. If the plaintiff establishes a *prima facie* case, the defendant must proffer evidence of a non-discriminatory reason for its actions, *id.*; *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003), and upon such proffer the plaintiff must demonstrate that the defendant's reason is a mere pretext for discrimination, *McDonnell Douglas*, 411 U.S. at 804; *Terry*, 336 F.3d at 138. A Title VII plaintiff establishes discrimination if she demonstrates "that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

### A. Prima Facie Case

"In order to establish a prima facie case of discriminatory termination of employment [under Title VII], the plaintiff must show that she belongs to a protected class, that she was performing her duties satisfactorily, and that she was discharged under circumstances giving rise to an inference of discrimination on the basis of h[is] membership in the protected class." *Gomez v. Pellicone*, 986 F. Supp. 220, 227 (S.D.N.Y. 1997) (citing *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997)). "[T]he level of proof a plaintiff is required to present in order to

18

establish a prima facie case of discrimination is low." *De la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 20 (2d Cir. 1996) (citation omitted).  Defendants assert that Plaintiff cannot establish a *prima facie* case because she was not performing her job satisfactorily and because the circumstances of her termination do not give rise to an inference of discrimination based on national origin.

### 1. Plaintiff's Job Performance

With respect to job performance, Plaintiff "need not demonstrate that h[er] performance was flawless or superior.  Rather, [s]he need only demonstrate that [s]he 'possesses the basic skills necessary for performance of [the] job.'" *De la Cruz*, 82 F.3d at 20 (quoting *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir.), *cert. denied*, 439 U.S. 984 (1978)).  Here, Plaintiff's performance reviews contained both positive and negative comments.  Each review stated that she "demonstrates knowledge of the target language" and that "[c]lassroom routines and procedures are clear and function smoothly."  (*See* Mendez Aff. Ex. G, at 3.)  Even her final review states she "has made some progress in her lesson development" and she "is a dedicated teacher."  (*Id.* at 2–3.)  Based upon these comments and upon Plaintiff's qualifications previously mentioned in the age discrimination discussion, Plaintiff demonstrates she "possesses the basic skills necessary" to perform the job.  *De la Cruz*, 82 F.3d at 20.  Although Defendants proffer evidence which tends to indicate there was a non-discriminatory reason for their action, it is insufficient to diminish Plaintiff's *prima facie* showing of satisfactory job performance.

### 2. Inference of Discrimination

#### a. Comments

Defendants assert that Organisciak and Kolahifar's alleged statements suggesting that Plaintiff should work in Chinatown are insufficient to raise an inference of discrimination because the comments were purportedly made by non-decisionmakers after Plaintiff was informed she was being terminated. However, Plaintiff's meeting with Organisciak and Kolahifar occurred only four days after Kolahifar and Mendez informed Plaintiff she was being fired. Plaintiff met with Organisciak and Kolahifar in an attempt to extend her employment for at least another year. Although Defendants assert that Mendez was the sole decision maker, the evidence when viewed in the light most favorable to Plaintiff does not support such a conclusion.

Mendez affirms that his "recommendation" to fire Plaintiff was solely his own, yet Organisciak wrote the notice of recommended discontinuance in which he asserted *he* intended to recommend to the board of education that Plaintiff be terminated. Further, a fact finder could reasonably infer that Kolahifar, as the Assistant Superintendent in charge of Human Resources for the District, had some input into hiring and firing decisions. It is undisputed that Kolahifar was present at both meetings wherein Plaintiff was informed that she was being terminated and that the decision would not be reconsidered. His involvement suggests he is more than a mere paper pusher. This inference, along with the evidence that Organisciak, the Superintendent for the District, played a role in hiring and firing decisions, is supported by the fact that Kolahifar's predecessor sent Plaintiff the letter informing her that she was to be hired, "subject to the approval of the Superintendent." Thus, Defendants fail to show that Organisciak and Kolahifar—who both confirmed quite forcefully that Plaintiff would be terminated—are not

decision makers.[6]

Defendants' reliance on *McLee v. Chrysler Corp*, 109 F.3d 130 (2d Cir. 1997), for the proposition that the allegation of discrimination arising after the decision to terminate Plaintiff makes Organisciak and Kolahifar's statements irrelevant, is unavailing.  In *McLee*, the plaintiff contacted his company's human relations office to inform them of alleged racial discrimination only after being informed of his impending termination. 109 F.3d at 136.  In support of his claim, the plaintiff referenced a supervisor's comment that he was "in the process of doing all the paperwork to throw [the plaintiff] out in the street" and commented that "I feel there is a case of unjust discrimination." *Id.* at 136.  The plaintiff conceded that the supervisor with the alleged discriminatory animus was not consulted in the decision to terminate him.  *Id.* at 137.  Here, by contrast, Plaintiff testified at the 50-h hearing that Organisciak and Kolahifar made discriminatory comments to her about working in Chinatown for her own people.  Additionally, the evidence demonstrates that Plaintiff met with Organisciak and Kolahifar, administrators with the District, for the purpose of seeking to rescind Mendez's recommendation to terminate her. The evidence further suggests that Organisciak and Kolahifar were consulted regarding Plaintiff's termination and that they were involved in the decision making process.  Thus, Organisciak and Kolahifar's alleged statements, though made after Mendez informed Plaintiff that he was to recommend that she be fired, are relevant and sufficient to create an inference of discrimination.

---

[6] Defendants fail to proffer statements from Organisciak and Kolahifar explaining their roles, or lack thereof, in making personnel decisions.  They also fail to proffer evidence describing the hiring process more generally.  More significantly, no evidence proffered shows Organisciak or Kolahifar refuting Plaintiff's account of their statements at the meeting in question.

### b. Same Actor Inference

Defendants assert that the "same actor" inference warrants dismissal of Plaintiff's claim because Mendez was involved in both hiring and firing Plaintiff.  As the Second Circuit has recognized,

> some factors strongly suggest that invidious discrimination was unlikely.  For example, when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.  This is especially so when the firing has occurred only a short time after hiring.

*Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) (age discrimination case); *accord Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000).[7]  The same actor inference developed because "it is suspect to claim that the same manager who hired a person in the protected class would suddenly develop an aversion to members of that class." *Ramos v. Marriott Int'l*, 134 F. Supp. 2d 328, 345 (S.D.N.Y. 2001) (internal quotation marks omitted). "The inference is applicable so long as one management-level employee played a substantial role in both the hiring and firing of the plaintiff." *Dorcely v. Wyandanch Union Free Sch. Dist.*, 665 F. Supp. 2d 178, 198 (E.D.N.Y. 2009) (equal protection claim); *accord Jones v. Yonkers Pub. Schs.*, 326 F. Supp. 2d 526, 546 (S.D.N.Y. 2004) (Title VII race discrimination claim); *Ramos*, 134 F. Supp. 2d at 345 (Title VII gender discrimination claim).  "[W]here the interim period is under two years, the same actor inference remains significant." *Campbell v. Alliance Nat'l, Inc.*, 107 F. Supp. 2d 234, 248 (S.D.N.Y. 2000).  However, "the inference is less compelling when a significant period of time elapses between the hiring and firing." *Carlton v. Mystic Transp., Inc.*,

---

[7] The "same actor inference" also applies in the Title VII context.  *See Filozof v. Monroe Cmty. Coll.*, 411 F. App'x 423, 427 (2d Cir. 2011) (affirming summary judgment for employer on Title VII racial discrimination claim); *Mastrolillo v. Connecticut*, 352 F. App'x 472, 474 (2d Cir. 2009) (affirming summary judgment for employer on Title VII sex discrimination claim); *De la Cruz v. City of New York*, 783 F. Supp. 2d 622, 642 (S.D.N.Y. 2011) (Title VII national origin discrimination claim).

202 F.3d 129, 138 (2d Cir. 2000) (seven years between hiring and firing weakens inference).

Moreover, "the same-actor inference is merely plausible and should not be used as a substitute

for a thorough fact inquiry." *Ramos*, 134 F. Supp. 2d at 345 (citing *Copeland v. Rosen*, 38 F.

Supp. 2d 298, 305 (S.D.N.Y. 1999); *Watt v. N.Y. Botanical Garden*, No. 98 Civ. 1095 (BSJ),

2000 WL 193626, at *7 (S.D.N.Y. Feb. 16, 2000) (noting that "application of the same actor

inference is permissible—as opposed to required")).

Here, although Mendez is not alleged to have discriminated against Plaintiff on the basis

of her national origin, Organisciak—who purportedly stated that Plaintiff should work in

Chinatown—may have played a substantial role in the hiring and firing decisions. *Jones*, 326 F.

Supp. 2d at 546. As such, the same actor inference may arise in this case. Nevertheless, because

Organisciak's discriminatory animus is evident from his unrefuted Chinatown statement, the

inference is insufficient here to show that invidious discrimination was unlikely. *Ramos*, 134 F.

Supp. 2d at 345; *cf. Grady*, 130 F.3d at 560. Thus, Organisciak and Kolahifar's comments are

sufficient to establish Plaintiff's *prima facie* showing of discrimination.

### B. Non-Discriminatory Rationale and Pretext

Defendants assert that Plaintiff was terminated based on her less than stellar job

performance. In support, Defendants rely on Plaintiff's performance reviews, wherein Mendez

listed instances of shortcomings in performing her job responsibilities. Such evidence is

sufficient to meet their burden of proffering a non-discriminatory rationale for Plaintiff's

termination.

To assert that Plaintiff cannot establish pretext, Defendants reassert their previous

argument—already discounted in viewing the evidence in the light most favorable to Plaintiff—

that Organisciak and Kolahifar were not decision makers. In support, Defendants rely on a

23

concurring opinion in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring), for the proposition that statements made by decision makers unrelated to the decisional process do not satisfy Plaintiff's burden to prove discrimination.  However, this reliance is misplaced.  The cited portion of the concurring opinion discusses the appropriateness of shifting the burden of persuasion to a defendant, where there is direct evidence of discrimination, to prove an employment decision was based on legitimate criteria, *id.*, a burden shifting framework that no longer applies, *see* 42 U.S.C. § 2000e-2(m) (Title VII plaintiff establishes discrimination if she demonstrates "that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice"); *cf. Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 757 (2d Cir. 2004) (citing *Trans World Airlines v. Thurston*, 469 U.S. 111, 121 (1985)) (holding that a Title VII plaintiff "need not show circumstances giving rise to an inference of discrimination when the plaintiff presents direct evidence of discrimination").  It is well settled that, at best, an employer which demonstrates it would have made the same decision without the discriminatory animus merely shields itself from certain monetary damages and a reinstatement order.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2526 (2013) (quoting 42 U.S.C. § 2000e-2(m)(i)-(ii)).  In any event, the parties do not couch their arguments as asserting direct evidence of discriminatory animus, which, if the Chinatown comments were viewed thus, would not warrant the Court to grant summary judgment.  *Cf. Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992) (discussing propriety of jury instructions for mixed-motive claim where direct evidence of discrimination exists).

    In sum, a rational fact finder could determine that the Chinatown comments were related to or informative of the decisional process which resulted in Plaintiff's termination, as they were

made very closely in time to Plaintiff's receipt of Organisciak's letter wherein he advised her of his intention to recommend to the board of education that she be fired.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (holding that court's function on summary judgment motion is not to weigh the evidence or determine the truth of the matter).  Accordingly, Defendants' motion for summary judgment seeking to dismiss the Title VII national origin discrimination claim must be denied.

## V. AFTER ACQUIRED EVIDENCE DOES NOT BAR CLAIMS

Defendants assert entitlement to summary judgment as to both discrimination claims because they acquired evidence after the decision to terminate Plaintiff was made which would have been an independent, legitimate non-discriminatory reason for firing her.  Specifically, Defendants discovered that Plaintiff purposely omitted relevant information from her job application by failing to disclose that she was fired from Croton-Harmon and denied tenure by the New York City Board of Education.  Defendants mistakenly rely on *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 356–58 (1995), in support of their position that such after-acquired evidence would not render them liable.

In *McKennon*, a case involving age discrimination, the Supreme Court expressly rejected the theory that evidence which would have warranted termination of employment for non-discriminatory reasons but was acquired after the employee was terminated bars all recovery.  *Id.* at 356–57.  The Supreme Court accepted lower court findings that the plaintiff would have been fired for certain misconduct which was uncovered after her termination, and assumed for purposes of the summary judgment motion that the sole reason for the employee's termination was her age.  *Id.* at 356.   The Court stated: "We do question the legal conclusion reached by [some circuit] courts that after-acquired evidence of wrongdoing which would have resulted in

25

discharge bars employees from any relief under the ADEA.  That ruling is incorrect." *Id.*  The

Supreme Court explained that even if the employer would have terminated the employee based

on the after-acquired evidence, "it does not follow . . . that the [evidence] renders it irrelevant

whether or not [the employee] was discriminated against." *Id.* at 356–57 (internal quotation

marks omitted).  Such after-acquired evidence is relevant only with regard to the appropriate

remedy, as it "may render the employee ineligible for front-pay and reinstatement and limit back

pay to the period between the unlawful termination and the date on which the discovery was

made." *Vichare v. AMBAC Inc.*, 106 F.3d 457, 468 (2d Cir. 1996) (citing *McKennon*, 513 U.S.

at 361–62 ("[A]s a general rule, in cases of this type, neither reinstatement nor front pay is an

appropriate remedy.")).  Significantly, "[a]lthough *McKennon* involved a claim under the

ADEA, its rationale is applicable to Title VIII." *Id.* at 468 n.5.

Accordingly, Defendants' motion for summary judgment seeking to dismiss the Title VII

national origin discrimination claim must be denied, as the claim cannot be dismissed merely

because Plaintiff would have been fired due to after-acquired evidence.

## VI. MOTION TO DISMISS FOR INSUFFICIENT PROCESS

Defendants assert that the District is entitled to dismissal because it was never served

with the Complaint.  (*See* Defs.' Br. 1, 20 (citing Fed. R. Civ. P. 12(b)(4) (allowing motions to

dismiss for "insufficient process")).)  The docket sheet shows that only Mendez, Kolahifar, and

Organisciak were served.  (*See* Docs. 8–10.)  The Complaint, which is a form complaint for

employment discrimination, names four Defendants in the caption.  (Compl. at 1.)  However,

where the Complaint directed Plaintiff to "list all defendants' names and the address where each

defendant may be served," she omitted the District from her list.  (*Id.* at 2.)  Thus, when the

Clerk's office sent Plaintiff the Rule 4 packet on May 30, 2013, after the Court issued the Order

of Service, (Doc. 7, at 1 (instructing Clerk to send "one U.S. Marshals Service Process Receipt and Return form ('USM-285') for each Defendant")), Plaintiff may have received only three forms, instead of four, to complete and return to the Court for the Marshals to serve the Complaint on Defendants.  Therefore, the Court shall instruct the Clerk of Court to send Plaintiff another USM-285 form and grant Plaintiff additional time to serve her Complaint on the District—which has been fully aware of the instant action and would not be prejudiced by such additional time for service.

## VII. UNIVERSAL DECLARATION OF HUMAN RIGHTS

Defendants do not address Plaintiff's third claim, which asserts a violation of Article 23 of the Universal Declaration of Human Rights.  (Compl. at 6.)  Nevertheless, the Universal Declaration of Human Rights does not provide a private right of action in federal courts.  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 734–35 (2004); *Chinloy v. Seabrook*, No. 14-CV-350 (MKB), 2014 WL 1343023, at *4, (E.D.N.Y. Apr. 3, 2014).  Thus, Plaintiff does not state a claim on which relief may be granted, and the claim must be dismissed.  28 U.S.C. § 1915(e)(2)(B)(ii) (where a plaintiff is granted *in forma pauperis* status, "the court shall dismiss the case at any time if the court determines that . . . the action . . . fails to state a claim on which relief may be granted . . . ."); *cf. Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (noting that 28 U.S.C. § 1915 grants courts "authority to dismiss a [frivolous] claim based on an indisputably meritless legal theory").

27

## VIII. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED in part, to the extent of dismissing Plaintiff's age discrimination claim under the ADEA and Plaintiff's claim under the Universal Declaration of Human Rights, and otherwise DENIED. The District's motion to dismiss for insufficient process is DENIED without prejudice to renewal if Plaintiff fails to effect service on the District as instructed below.  The Clerk of Court is respectfully directed to terminate this motion (Doc. 28).

The Clerk of Court is also instructed to send Plaintiff one USM-285 form to allow Plaintiff to effect service on Defendant New Rochelle Public School District through the U.S. Marshals Service.  Within thirty (30) days of the date of this Order, Plaintiff must complete the USM-285 form for the District and return the form to the Court.

If Plaintiff does not wish to use the Marshals Service to effect service, she must notify the Court in writing within thirty (30) days of the date of this Order and request that a summons be issued directly to her.  If within thirty (30) days, Plaintiff has not returned the USM-285 form or requested a summons, under Rule 41(b) of the Federal Rules of Civil Procedure, the Court may dismiss the action as against the District for failure to prosecute.

Upon receipt of the completed USM-285 form, the Clerk of Court shall issue a summons and deliver to the Marshals Service all of the paperwork necessary for the Marshals Service to effect service upon each Defendant.

Regardless of which method of service Plaintiff chooses, she must effect service within 120 days of the date the summons is issued.  It is Plaintiff's responsibility to inquire of the Marshals Service as to whether service has been made and, if necessary, to request an extension of time for service.  *See Meilleur v. Strong*, 682 F.3d 56, 63 (2d Cir.), *cert. denied*, 133 S. Ct.

28

655 (2012). If within 120 days of issuance of the summons, Plaintiff has not made service or requested an extension of time in which to do so, under Rules 4(m) and 41(b) of the Federal Rules of Civil Procedure, the Court may dismiss this action as against the District for failure to prosecute.

Defendants shall file an answer or answers to the Complaint within thirty (30) days from the day the District is served with the Complaint.

Dated: June 19th, 2014
      White Plains, New York

SO ORDERED:

                                  6/19/14
                 NELSON S. ROMÁN
             United States District Judge