UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HUI ALTMAN,

                              Plaintiffs,

    -against-

NEW ROCHELLE PUBLIC SCHOOL DISTRICT
n/k/a CITY SCHOOL DISTRICT OF NEW
ROCHELLE, et al.,

                              Defendant.

No. 13 Civ. 3253 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff Hui Altman's remaining claim of discrimination in violation of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e17, against Defendant New Rochelle Public

School District (the "District") is premised on the allegation that the decision to terminate her

from her teaching position with the District was based in part on her national origin.  In

anticipation of trial, scheduled to begin on January 30, 2017, Plaintiff has moved *in limine* to

preclude Defendant from introducing certain evidence at trial and moved to bifurcate the liability

and damages portions of trial.

For the following reasons, the motions are GRANTED in part and DENIED in part.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/6/2017

**BACKGROUND**

I.      **Factual Allegations[1]**

Plaintiff is a native of China.  On or about May 20, 2010, Plaintiff applied for a full-time

Mandarin Chinese teaching position in the Defendant District's schools by submitting a cover

letter and resume.  On June 25, 2010, she submitted a formal application to the District, where

she represented that she had never been fired from any employment or denied tenure or

reappointment.[2]  Juan Mendez, supervisor of the District's World Languages Department,

recommended Plaintiff for the Mandarin teaching position with the District.  On July 29, 2010,

the District's now-retired Assistant to the Superintendent for Human Resources sent Plaintiff a

letter informing her that she would be recommended for the position, "subject to the approval of

the Superintendent of Schools [Richard Organisciak] and the Board of Education."  Plaintiff's

probationary appointment was to be effective September 1, 2010 through September 1, 2013,

during which time she would not be tenured.

Plaintiff accepted the position.  Her employment with the District involved teaching

Mandarin at two elementary schools and one middle school.  Mendez was Plaintiff's direct

supervisor, and, as with other teachers within his department, he provided support and guidance

to Plaintiff for her professional development.  He conducted three formal classroom observations

during each of the two years Plaintiff was employed and allegedly provided her copies of the

---

[1] The Court presumes the parties' familiarity with the facts previously summarized in its Opinion and Order on Defendants' first motion for summary judgment and will not restate them in total here.  *See generally Altman v. New Rochelle Pub. Sch. Dist.*, No. 13 Civ. 3253 (NSR), 2014 WL 2809134 (S.D.N.Y. June 19, 2014) (ECF No. 44).  This reduced factual summary is included to provide the necessary context for the evidentiary motions.  References to quoted materials can be found in the prior Opinion and Order.

[2] Plaintiff applied for the position while employed as a part-time Mandarin Chinese teacher in a middle school in White Plains, New York.  On her application and resume, Plaintiff listed previous part-time positions with Ossining High School and the White Plains position, and previous full-time positions teaching English or English as a Second Language ("ESL") at Monroe College, Westchester Community College, and the New York City public schools.

performance reviews with his written comments.  He also conducted informal classroom observations of Plaintiff.  In each review, Mendez wrote a description of class activities followed by comments and recommendations for improvement.

Generally, the reviews were mixed, containing both positive and negative feedback. Plaintiff and Mendez signed all except the final formal review of March 22, 2012.  The negative portion of that review echoed prior reviews: in Mendez's view, Plaintiff had "made some progress in her lesson development and implementation," but "her lack of consistency and thoroughness continue[d] to hinder her professional growth."  He found the observed lesson "not suitable in terms of readiness and content" for the class.  He noted that "activities did not connect and were left undone," that Plaintiff "did not provide closure for the exercises," and that Plaintiff "did not spend any time breaking down for the class the vocabulary or phrases being used."  He expressed his opinion that it was "pivotal that [Plaintiff] create[] lessons that are differentiated in order to assure that all [] levels of proficiency in her class are being addressed."

On March 23, 2012, Reza Kolahifar, the current Assistant to the Superintendent for Human Resources at that time, wrote to Plaintiff asking her to meet with him and Mendez on March 29, 2012.  On March 26, 2012, Mendez apparently prepared an annual teacher's evaluation report recommending Plaintiff's probationary service be discontinued.  Neither he nor Plaintiff signed the document.  Mendez attached to the annual evaluation the comments sections of the six formal observations, and a summary dated March 26, 2012, which stated in part: "To date, [Plaintiff] has demonstrated no significant longitudinal professional growth.  Therefore, I do not recommend the continuance of probationary service for [Plaintiff]."[3]

---

[3] Plaintiff testified at a 50-h hearing related to this action that she had never seen the summary prior to that hearing, though Mendez claims that Plaintiff refused to sign it.

On March 29, 2012, Plaintiff appeared in Kolahifar's office for the scheduled meeting. Kolahifar told Plaintiff she would not be receiving tenure and, instead, was terminated.[4]  At the meeting, Plaintiff was given a letter from Organisciak stating that he intended "to recommend to the Board of Education . . . that [her] employment be terminated and [her] appointment with the [District] discontinued . . . effective June 30, 2012."  Plaintiff recalls exclaiming to Mendez, "If anything happened to my career, you are responsible! You are a sick man! I hate you!"  In contrast, Mendez recalls her saying, "in sum and substance, 'when I kill myself, it will be on your conscience' while making a slashing motion with her finger across her throat."

Plaintiff left the meeting and proceeded to the school where she was to teach her next class.  She ended up speaking with the school's version in his office.  While there, police arrived, explaining that someone at the District's office reported that Plaintiff wanted to kill herself.  According to the police report, eight officers and an ambulance responded to the call, and Kolahifar told police that Plaintiff had become "emotionally upset and stated 'when I kill myself it will be your fault!' . . . [and had] made several remarks about harming herself."  Plaintiff, after initially refusing treatment, proceeded to the hospital voluntarily in an ambulance and was released soon thereafter.  The incident was the subject of a local internet blog post, as well as a state court proceeding for defamation.[5]

---

[4] In denying summary judgment, the Court considered Plaintiff's *pro se* affidavit, purportedly of her contemporaneous journal entries, which corroborated certain portions of the alleged conversation between Plaintiff, Kolahifar, and Mendez.  In response to Defendants' arguments that the journal entries were hearsay that did not fit within any exception, the Court explained that Plaintiff's version of events also appeared in her 50-h hearing testimony, which was offered as evidence by Defendants.  The Court then considered the corroborating journal entries as statements attributable to either Plaintiff or Defendants.  *See* Fed. R. Evid. 801(d)(2)(A).

[5] In that action, summary judgment in favor of Kolahifar and the District was denied, *see Altman v. New Rochelle Pub. Sch. Dist.*, No. 51159/2013, Slip Op. at 3 (Mot. Seq. No. 002) (Sup. Ct. Westchester Cnty. Mar. 25, 2014), but the jury returned a verdict in their favor after a six day trial.  *Altman*, Slip Op. at 1 (Mot. Seq. No. 005) (Sup. Ct. Westchester Cnty. Oct. 16, 2015).  The state court action is distinct from the instant discrimination action—as this Court previously explained: "Plaintiff may prove her Title VII claim by demonstrating that the 'impermissible factor was a motivating factor, without proving that the employer's proffered explanation was not some part of the employer's motivation.'"  *Altman*, 2016 WL 3181153, at *5 (S.D.N.Y. June 2, 2016) (citations omitted).

4

Plaintiff set up a meeting with Organisciak and Kolahifar on April 2, 2012.  She apparently brought documentation from a physician stating she was fit to return to work. Plaintiff testified that she asked Organisciak to allow her to finish the third year on her contract, but that Organisciak was very nasty to her and said, "You don't tell me what to do. You're terminated."  Plaintiff tried to give Organisciak some references, but he said he was from the City (*i.e.*, of New York) and knew what had transpired there through his connections but declined to elaborate.  This reference was apparently regarding the termination of and denial of tenure to Plaintiff in 2004 by the New York City Department of Education, and the subsequent discrimination action she brought against the Department in the Southern District of New York. *See Altman v. N.Y. City Dep't of Educ.*, No. 06 Civ. 6319 (HB), 2007 WL 4372824, at *7 (S.D.N.Y. Dec. 12, 2007) (after a bench trial, Plaintiff's claim of national origin discrimination was dismissed for failure to establish evidence of a discriminatory intent to deny her tenure).

Plaintiff asked whether Organisciak could find her a job through his connections, and Organisciak allegedly responded, "Why don't you work in Chinatown?"  Plaintiff stated this suggestion made no sense because she lived in Westchester County and had to care for her husband, who has Parkinson's disease.  Kolahifar then allegedly stated, "Maybe it's better [that you] work for your own people."

On April 5, 2012, Organisciak wrote Plaintiff a letter informing her that she was being placed on administrative leave with pay, effective immediately.  He instructed her to return any school-owned property to him by April 16, 2012.  On April 16, 2012, Plaintiff arranged to meet Kolahifar at a school to retrieve her belongings.  Kolahifar handed Plaintiff another letter from Organisciak informing her that her effective date of termination had been advanced by one-month—it would be June 1, 2012 instead of June 30, 2012.  This change was purportedly due to

5

"information about [Plaintiff's] termination from the Croton-Harmon School District," a job which Plaintiff did not include on her resume or job application.  On April 17, 2012, Organisciak reported Plaintiff's failure to include the Croton-Harmon job on her application and resume to the State Education Department Teacher Discipline Unit, raising a question as to Plaintiff's moral character.[6]  Plaintiff testified that she in fact resigned from the position because the other Chinese teacher was uncooperative.  On April 25, 2012, Plaintiff sent a letter to the District explaining that she had resigned from the Croton-Harmon job and asking the District's board to adhere to the original termination date of June 30, 2012, as stated in the March 29, 2012 letter.

On May 2, 2012, the District's board sent Plaintiff notification that, by majority vote on May 1, 2012, her employment was to be terminated "as of the close of business June 1, 2012" based "upon the recommendation of the Superintendent of Schools," Organisciak.

## II.    Procedural Background

On June 19, 2014, the Court converted Defendants' motion to dismiss into a motion for summary judgment, and granted summary judgment in favor of Defendants with respect to Plaintiff's age discrimination claim.  *Altman v. New Rochelle Pub. Sch. Dist.*, No. 13 Civ. 3253 (NSR), 2014 WL 2809134, at *10 (S.D.N.Y. June 19, 2014) (ECF No. 44).  The individual defendants, Mendez, Kolahifar, and Organisciak, were subsequently dismissed from the action. (*See* ECF Nos. 51, 72.)  On June 2, 2016, the Court denied the Defendant District's motion for summary judgment on Plaintiff's remaining claim for national origin discrimination, concluding that "[a]lthough there is sufficient evidence for a jury to conclude that the District terminated Plaintiff solely based on her performance, there is enough evidence to the contrary that the Court

---

[6] On summary judgment, Defendants relied on minutes of a Croton-Harmon School District board meeting held February 22, 2010, wherein the board voted to terminate Plaintiff's employment as a Mandarin teacher effective immediately.  Plaintiff countered with a copy of her letter of resignation dated the same day.

cannot remove this case from the jury and decide it as a matter of law." *Altman*, 2016 WL 3181153, at *5 (S.D.N.Y. June 2, 2016) (ECF No. 97).

III. **Evidence at Issue**

Defendant now seeks to introduce a variety of pre- and post-termination evidence relating to Plaintiff's former employers, prior litigation, her threat to harm herself at the meeting where she was terminated, and the metadata from her allegedly contemporaneous journal entries.  (*See* Proposed Joint Pretrial Order ("JPO") at 5-19 (providing anticipated witnesses, deposition transcript designations, and proposed exhibits ("Prop. Exs.")), ECF No. 100.)

a. **Former Employers and Related Litigation**

i. **New York City Department of Education**

Defendant seeks to introduce evidence of Plaintiff's lawsuits against her former employer, the New York City Department of Education, relating to her termination from a teaching position with the New York City schools.  (*See* Prop. Ex. B (New York Article 78 Decision), Ex. C (S.D.N.Y. discrimination suit Opinion and Order).)  Defendant also plans to offer the transcript excerpts of Steven Saul Chernigoff, Claralee Irobunda, and David Kroun's testimony from the bench trial that took place in the discrimination suit concerning her termination.  Similarly, Defendant seeks to offer evidence introduced in that action relating to Plaintiff's termination and performance as a teacher at that time.  (*See* Prop. Exs. KKK, NNN-VVV, XXX.)

ii. **Croton-Harmon Union Free School District**

Defendant seeks to introduce the February 22, 2010 resolution of the Croton-Harmon Union Free School District as evidence that Plaintiff was terminated from that position, though she did not report the termination on her application with Defendant.  (*See* Prop. Ex. G.)

Defendant plans to call as witnesses Barbara Ulm and Dr. Edward Furhman Jr. regarding

Plaintiff's employment and termination from the Croton-Harmon district, and also plans to offer

into evidence affidavits from both witnesses.  (*See* Prop. Exs. FFFF, HHHH.)  Defendant also

seeks to introduce a series of alleged correspondence between Plaintiff and Ms. Ulm, and

between Plaintiff and Dr. Furhman.  (*See* Prop. Exs. D-F, H-J, CC-EE, IIII-LLLL.)  Defendant

would call Kimberlee Johnson as a witness to testify as to authentication of these documents.

### b.   Threat of Suicide, Related Subjects, and Defamation Lawsuit

Defendant plans to introduce the police report from the March 29, 2012 incident as well

as testimony from Sgt. Kevin Perri as to his interactions with Plaintiff and as to the Incident

Report.  (*See* Prop. Ex. X.)  The District would also like to introduce subsequent blog coverage

of the incident and Plaintiff's alleged comments to the blogger.  (*See* Prop. Exs. BBBB-EEEE.)

Defendant similarly seeks to introduce the jury verdict sheet from Plaintiff's related defamation

action against the District and individual defendants dismissed from this action, alleging the

suicide threat and report of her poor teaching performance were defamatory and untrue.  (*See*

Prop. Ex. FF (jury found the statements made by the individual defendants were true).)

### c.   Litigation against the Rye YMCA

Defendant would also like to introduce the complaint from Plaintiff's lawsuit against the

Rye YMCA alleging harassment and bullying, including a December 2, 2011 letter from Plaintiff

to Judge Preska—who presided over that action—where Plaintiff wrote "Please do help and do

something before tragedies happening [sic]."  (*See* Prop. Exs. YYY, ZZZ.)

### d.   Metadata and Document Authentication

Defendants plan to call Dr. Christine Coleman to testify as to authentication of

documents and electronic searches conducted by Defendant.  Similarly, Defendant would like to

introduce metadata related to Plaintiff's Affidavit of her Journal Entries.  (*See* Prop. Ex. MMM

(metadata); *see also* Prop. Ex. LLL (the affidavit).)

### e.   Other Post-termination Statements and Communications

Defendant would also like to introduce correspondence between the District and Plaintiff

occurring after the decision to terminate her from the position.  (*See* Prop. Exs. Z-BB.)

## LEGAL STANDARDS GOVERNING PRELIMINARY RULINGS ON THE ADMISSIBILITY OF EVIDENCE

"The purpose of an *in limine* motion is to aid the trial process by enabling the Court to

rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are

definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v.*

*Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (internal citation and quotation marks omitted); *see*

*generally Luce v. United States*, 469 U.S. 38 (1984).  Upon such a motion, the Court is called

upon "to make a preliminary determination on the admissibility of the evidence under Rule 104

of the Federal Rules of Evidence."  *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d

461, 467 (S.D.N.Y. 2005).  Only evidence that is "clearly inadmissible on all potential grounds"

should be excluded on a motion *in limine*.  *United States v. Paredes*, 176 F. Supp. 2d 179, 181

(S.D.N.Y. 2001) (internal citations omitted).

The Court looks to Rules 401, 402, and 403 of the Federal Rules of Evidence to

determine whether the contested evidence is admissible at trial.  Under Rule 402, only relevant

evidence is admissible.  Evidence is relevant if "it has any tendency to make a fact more or less

probable than it would be without the evidence . . . and the fact is of consequence in determining

the action."  Fed. R. Evid. 401.  Relevant evidence may still be excluded by the Court "if its

probative value is substantially outweighed by a danger of one or more of the following: unfair

prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly

presenting cumulative evidence." Fed. R. Evid. 403. Though the "standard of relevance established by the Federal Rules of Evidence is not high," *United States v. Southland Corp.*, 760 F.2d 1366, 1375 (2d Cir. 1985), the Court has "broad discretion to balance probative value against possible prejudice" under Rule 403. *United States v. Bermudez*, 529 F.3d 158, 161 (2d Cir. 2008) (citing *United States v. LaFlam*, 369 F.3d 153, 155 (2d Cir. 2004)); *see also Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008) (quoting *United States v. Abel*, 469 U.S. 45, 54 (1984)) ("Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403").

As the Court does not have the benefit of viewing the proposed evidence in the context of trial, an *in limine* ruling may be "subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the [party's] proffer." *Paredes*, 176 F. Supp. 2d at 181 (quoting *Luce*, 469 U.S. at 41). Similarly, "[i]f the potential relevance of evidence is uncertain prior to trial, the court may choose to reserve judgment." *Goodwine v. National R.R. Passenger Corp.*, No. 12 Civ. 3882 (TLM), 2014 WL 1010928, at *1 (E.D.N.Y. Mar. 17, 2014) (citing *Bonilla v. Janovick*, No. 01 Civ. 3988 (SJF) (ETB), 2007 WL 3047087, at *2 (E.D.N.Y. Oct. 16, 2007)).

## DISCUSSION

In preparation for trial, Plaintiff now seeks to exclude the Defendant District's proffered evidence relating to: Plaintiff's prior lawsuits and terminations from the New York City and Croton-Harmon school districts where she was previously employed, post-termination statements allegedly attributable to Plaintiff, and the electronic metadata allegedly demonstrating the date

Plaintiff created her journal.[7]  Defendant has not challenged any of Plaintiff's proposed evidence, though the District clearly contests whether the alleged discriminatory statements made in close proximity to her termination—that she should "work in Chinatown" and it would be "better" for her to "work for [her] own people"—were ever made, and has maintained that Plaintiff's teaching performance was the motivating factor behind her termination.[8]

## I.      Permissible Usage of the Proffered Evidence at Trial

To prevail at trial, a Title VII plaintiff must prove by a preponderance of the evidence that "an impermissible factor [such as discrimination] was a motivating factor in the adverse employment action [alleged]."  *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 118 (2d Cir. 2000); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015) ("the 'motivating factor' standard still applies to discrimination claims based on . . . national origin"). In this case, for Plaintiff to prevail, a jury must conclude that: "1) Organisciak and Kolahifar made discriminatory statements to Plaintiff; 2) [they] played a meaningful role in the decision to terminate Plaintiff; and 3) based on the proximity of the discriminatory statements to Plaintiff's termination, Plaintiff's national origin was a motivating factor in the District's termination decision."  *Altman*, 2016 WL 3181153, at *5.  On that crucial first point, Defendant argues the alleged statements reflecting that Plaintiff should work with "her people" in "Chinatown" are a

---

[7] Plaintiff filed each motion *in limine* separately along with somewhat duplicative supporting memoranda.  (*See* Pl. Mot. *In Limine* to Exclude Evid. of Perf. Evals. by Other Schools, ECF No. 101; Mem. in Supp. ("Pl. Mem. Prior Evals."), ECF No. 102; Pl. Mot. *In Limine* to Exclude Evid. of Pl. Involvement in Other Litig., ECF No. 103; Mem. in Supp. ("Pl. Mem. Other Litig."), ECF No. 104; Pl. Mot. *In Limine* to Exclude Evid. of Certain Alleged Post-Termination Statements, ECF No. 105; Mem. in Supp. ("Pl. Mem. Post-Term."), ECF No. 106; Pl. Mot. *In Limine* to Exclude Proposed Def. Ex. MMM, ECF No. 107; Mem. in Supp. ("Pl. Mem. Metadata"), ECF No. 108.)

[8] Although the "intermediate evidentiary burdens shift back and forth" under the *McDonnell Douglas* framework, ultimately the "burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Risco v. McHugh*, 868 F. Supp. 2d 75, 99-100 (S.D.N.Y. 2012) (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805 (1973).

complete fabrication.  (Def. Combined Mem. of Law in Opp'n to Pl. Mot. to Bifurcate and Mots.
*In Limine* ("Def. Opp'n") at 8-10, ECF No. 115.)[9]  To tip the scales in its favor, Defendant may
proffer evidence supporting the magnitude of its non-discriminatory motivation for terminating
Plaintiff or evidence—if available—to disprove Plaintiff's allegations.  The bulk of the contested
evidence is, in fact, directed at impeaching Plaintiff's testimony and the veracity of her
allegations.  (*See generally id.*)

The Federal Rules of Evidence generally prohibit the introduction of character evidence
"to prove that on a particular occasion the person acted in accordance with the [asserted]
character or trait" demonstrated by such evidence—*i.e.* to prove someone lied when alleging
discrimination because that individual had lied in the past.  Fed. R. Evid. 404(a)(1).
Nevertheless, "[e]vidence of a witness's character may be admitted under Rules 607, 608, and
609" for impeachment purposes.  Fed. R. Evid. 404(a)(3).  Additionally, such evidence "may be
admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan,
knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).

As applicable here, "[a] witness's credibility may be attacked . . . by testimony about the
witness's reputation for having a character for . . . untruthfulness[.]"  Fed. R. Evid. 608(a)
(rebuttal evidence of a "truthful character is admissible only after the witness's character for
truthfulness has been attacked").  "[E]xtrinsic evidence is [generally] not admissible to prove
specific instances of a witness's conduct in order to attack or support the witness's character for
truthfulness."  Rule 608(b); *but see, e.g.*, *Carter v. Hewitt*, 617 F.2d 961, 970 (3d Cir. 1980)
(there was "no violation of the extrinsic evidence rule [where the Witness] did not deny having

---

[9] The Court is appreciative that Defendant provided the exhibits at issue in Plaintiff's motions *in limine*.  (*See* ECF Nos. 113 (declaration with exhibits), 114 (affidavit regarding journal metadata).)

written the letter; rather, he conceded his authorship but claimed that the letter was not an effort to encourage the filing of false complaints"). A court may allow inquiry of such evidence on cross-examination if it is "probative of the [witness's] character for truthfulness or untruthfulness[.]" Rule 608(b)(1); *Crimm v. Missouri Pac. R. Co.*, 750 F.2d 703, 707 (8th Cir. 1984) (Rule 608(b) permits "a witness to be cross-examined on specific instances of conduct probative of a witness' character for truthfulness or untruthfulness").

## II.     Preliminary Analysis of the Admissibility of the Proffered Evidence

Defendant's contention on summary judgment, in response to Plaintiff's *prima facie* case, was that the motivating factor for her termination was Plaintiff's deficient performance while teaching in the New Rochelle schools—no other reason has been presented. *Altman*, 2016 WL 3181153, at *4-5. Defendant's proffered evidence would be relevant and potentially admissible to the extent it supports the District's reasoning for terminating Plaintiff, rebuts Plaintiff's allegations of discrimination, undermines Plaintiff's credibility, or limits the damages available to Plaintiff. The Court considers each set of evidence in turn.

### a.  Evidence Related to Plaintiff's Former Employers

#### i.   Performance at the New York City Department of Education, Plaintiff's Termination, and Subsequent Lawsuit

##### 1. Performance

Although Defendant now seeks to offer evidence of Plaintiff's performance while teaching at the New York City public schools, Defendant has made no indication that it was aware of Plaintiff's performance at other schools when it decided to terminate her. Thus, any evidence the District seeks to introduce relating to Plaintiff's past performance at other school districts is wholly irrelevant to Defendant's decision to terminate Plaintiff and may not be introduced to support that decision. *See, e.g.*, *Baskerville v. Culligan Int'l Co.*, No. 93 C 5367,

1994 WL 162800, at *3 (N.D. Ill. Apr. 25, 1994) ("evidence of [employee's] prior work difficulties [with other employers] [could] not be introduced to establish that [he] was a poor employee"); *Cf. Heinemann v. Computer Assocs. Int'l, Inc.*, 319 F. App'x 591, 597 (9th Cir. 2009) (prior good performance was irrelevant since employee had subsequently been placed on a performance improvement plan for poor performance).

Notably, Plaintiff also plans to introduce two performance evaluations prepared by faculty of the White Plains School District prior to her employment with Defendant.  (Prop. Exs. 3 & 4.)  Defendant does not contest the admission of these evaluations, instead seeking to do the same by introducing evidence of other prior performance evaluations that, in Defendant's view, contradict Plaintiff's "effort to convince the jury that she was a good teacher prior to her time with the District."  (Def. Opp'n at 16 (noting the evaluations are "mostly favorable").)  But as the Court has explained: the issue for trial is what motivated Defendant's decision to terminate Plaintiff.  Although evidence of positive reviews prior to teaching in the District's schools might support an inference that Defendant's mixed reviews of Plaintiff were pretextual, Plaintiff cannot introduce these evaluations without opening the door to the evaluations Defendant seeks to offer. *See Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 266 (2d Cir. 1999) (a witness can open the door to impeachment evidence that contradicts the witness's testimony).  Moreover, these reviews would needlessly complicate the trial and lead to potential confusion.  *Martin v. Reno*, No. 96 Civ. 7646 (NRB), 2000 WL 1863765, at *4 (S.D.N.Y. Dec. 19, 2000) (plaintiff's allegedly good performance at other jobs was inadmissible since only his performance while

employed by the defendant was at issue, not his "entire employment history").  Therefore, these evaluations must also be excluded.[10]

### 2.  Termination and Subsequent Lawsuit

Similarly, there is no contention that the District took Plaintiff's termination from the New York City schools, or her subsequent suit against the Department of Education, into account when it decided to terminate her employment with the District.  Therefore, that evidence is also irrelevant and without probative value with regard to Defendant's purported non-discriminatory reason for terminating Plaintiff.  This evidence may, however, serve another purpose: Defendant suggests it is relevant to Plaintiff's veracity.  First, Defendant contends that the fact that "[P]laintiff lied to the District on her employment application"—demonstrated by her failure to report the termination—is admissible to impeach Plaintiff's credibility.  (Def. Opp'n at 2.) Second, Defendant may be implying that Plaintiff's suit against the Department of Education shows a *modus operandi* of suing former employers for discrimination when she is denied tenure or terminated.  (*Id.* at 13-16.)

Because Plaintiff is "the crucial witness" to her claim of discrimination, "the question of h[er] credibility [is] essential to the case."  *Vichare v. AMBAC Inc.*, 106 F.3d 457, 468 (2d Cir. 1996).  Her potential propensity for falsehoods is certainly relevant to her credibility.  *See id.* (collecting cases supporting the use of prior false statements on cross-examination to show a lack of credibility); *see also United States v. Lanham*, 541 F. App'x 34, 36 (2d Cir. 2013) ("evidence that [testifying defendant] placed assets in his son's bank account to frustrate tax liens and outstanding judgments . . . was appropriate under Fed. R. Evid. 608(b)" on the issue of the

---

[10] Should Plaintiff renew its intention to offer the reviews for such a purpose, in the interest of fairness Defendant would be able to introduce any contrary reviews from a similar timeframe.

15

defendant's truthfulness); *United States v. Zandi*, 769 F.2d 229, 236-37 (4th Cir. 1985) ("By taking the stand, [the defendant's] credibility became subject to attack on cross-examination."). Thus, Defendant is correct, (*see* Def. Opp'n at 5-6), that it may introduce some of the proffered evidence to contest whether the alleged statements were in fact Plaintiff's fabrications.

### a.  Failure to Report the Termination

Plaintiff reported her employment with the New York City schools on her application for the teaching position with the District, but she did not indicate she had been terminated or denied tenure by the Department of Education.  (*See* Prop. Ex. L.)  Defendant plans to introduce a host of evidence considered during Plaintiff's lawsuit against the Department of Education, discussed below, including the letter terminating her from that position.  (*See* Prop. Ex. KKK.)  Plaintiff's motions *in limine* generally ignore the permissible usage of this evidence: the demonstration that Plaintiff may have intentionally falsified her employment application, which bears directly on her credibility as a witness.  (*See* Pl. Mem. in Supp. Mot. to Bifurcate ("Pl. Bifurcation Mem.") at 4 ("no relevance to the core issue of the case"), ECF No. 111.)

The Court, recognizing that Plaintiff's credibility is the lynchpin to her claim of discrimination, will allow Defendant to cross-examine her as to her application, the fact that she answered "No" to the question of whether she had ever been terminated or denied tenure, and her termination from the New York City schools.  *See, e.g, Byrne v. Gainey Transp. Servs., Inc.*, No. 04 Civ. 2220 (KHV), 2005 WL 1799213, at *2 (D. Kan. July 11, 2005) (defendant was allowed to "cross-examine plaintiff on whether she falsified employment applications" because such falsification spoke "to plaintiff's credibility") (citing *Baskerville v. Culligan Int'l Co.*, No. 93 Civ. 5367, 1994 WL 162800, at *3 n.3 (N.D. Ill. Apr. 25, 1994)); *Baskerville*, 1994 WL 162800, at *3 n.3 ("[plaintiff's] allegedly false answers on her employment application [could] not be introduced as substantive evidence, [only] to impeach her credibility on cross-examination").

16

There is no need, however, at this juncture to allow the introduction of extrinsic evidence demonstrating her termination.  The Court will revisit this determination based on the testimony offered by Plaintiff at trial.  Should Plaintiff contest whether she was terminated by her former employer, the Court may consider whether to allow the introduction of the termination letter from the Department of Education.  *See Crimm*, 750 F.2d at 707 (within the court's discretion to determine that alleged evidence of falsehoods contained in Plaintiff's employment application—failing to disclose a prior conviction—was inadmissible where court determined it was "not probative of [plaintiff's] truthfulness because the falsification occurred two years before the sexual harassment incident and [plaintiff] subsequently admitted the conviction on [a subsequent] employment application . . . and [at] [her] deposition").

The Court agrees with Defendant that "[P]laintiff's termination is relevant" because it may demonstrate "she lied on her employment application to the District by claiming she had never been terminated from another teaching position"—but the fact of the termination and failure to disclose it is where the relevancy ends.  The reasons for her termination are irrelevant to the issues in this case, unless Plaintiff opens the door to them during her testimony.

### b.  Subsequent Suit Against the Department of Education

The District may be implying the evidence regarding Plaintiff's lawsuit against the Department of Education would be relevant and necessary to show her "motive, opportunity, intent, preparation, [or a] plan" to fabricate a discrimination suit.  *See* (Pl. Prior Litig. Mem. at 2-3; Def. Opp'n at 13-16); Fed. R. Evid. 404(b)(2).  The Second Circuit has applied the familiar two-part test of relevancy balanced against potential for prejudice to the admission of evidence of prior lawsuits.  *Outley v. City of New York*, 837 F.2d 587, 591-95 (2d Cir. 1988).  First the Court must determine if the prior suit is relevant to an alleged "plan" to fabricate a discrimination suit rather than merely prohibited character evidence.  *Id.* at 592.  Assuming the

suit is relevant to one or more pertinent issues at trial, the Court must consider whether the danger of unfair prejudice substantially outweighs the probative value of the prior lawsuit.  *Id.* at 592; *see* Fed. R. Evid. 403.  As a general matter, "a plaintiff's litigiousness may have some slight probative value, but that value is outweighed by the substantial danger of jury bias against the chronic litigant."  *Outley*, 837 F.2d at 592 (quoting *Raysor v. Port Authority*, 768 F.2d 34, 40 (2d Cir. 1985)); *accord Nelson v. City of Chicago*, 810 F.3d 1061, 1071-72 (7th Cir. 2016).

In the absence of proof that prior lawsuits were fraudulently filed, courts often prohibit their introduction in cases alleging similar violations due to the "very acute" risk of "unfair prejudice."  *Young v. Calhoun*, 85 Civ. 7584 (SWK), 1995 WL 169020 at *6 (S.D.N.Y. April 10, 1995) (excluding evidence of prior litigation because the defendant could not show the prior litigation was fraudulently filed); *see, e.g.*, *McDonough v. City of Quincy*, 452 F.3d 8, 20 (1st Cir. 2006) (affirming exclusion of evidence that Title VII plaintiff filed a prior lawsuit against his former employer after being denied a promotion); *Batiste-Davis v. Lincare, Inc.*, 526 F.3d 377, 380 (8th Cir. 2008) (affirming exclusion of evidence that Title VII plaintiff filed a prior lawsuit against a former employer where there was no indication lawsuit was fraudulently filed).

"There are rare exceptions when the evidence is admitted for reasons other than to show the plaintiff's litigious character and it is sufficiently probative to survive Rule 403 balancing." *Nelson*, 810 F.3d at 1071.  The Seventh Circuit in *Nelson* offered such an example from its prior decision in *Gastineau v. Fleet Mortgage Corp.*, 137 F.3d 490, 495 (7th Cir.1998).  In *Gastineau*, "a workplace sexual-harassment suit, [the Circuit] affirmed the district court's decision to admit testimony that the plaintiff had sued three of his former employers because the evidence was probative of his '*modus operandi* of creating fraudulent documents in anticipation of litigation.'" *Nelson*, 810 F.3d at 1071 (also acknowledging other reasons the evidence was admissible)

(citation omitted); *see also Barbee v. Southeastern Pa. Transp. Auth.*, 323 F. App'x 159, 162 (3d Cir. 2009) (affirming district court's decision to admit evidence of plaintiff's "involvement in at least 24 prior civil suits for impeachment purposes because [he] was evasive about prior lawsuits in his deposition"). But in contrast to *Gastineau*, the *Nelson* Court found that plaintiff's history of suing the Chicago Police Department did not qualify as evidence for impeachment purposes where "[n]othing in his direct testimony could be contradicted by evidence that he had filed other suits against the City." *Id.* at 1072.

As indicated above, evidence of Plaintiff's termination from the New York City schools is admissible on cross-examination to impeach her credibility—and if there was no direct evidence of the that termination available, then the existence of the litigation might become relevant on that issue. Fortunately for Defendant, the termination letter from the Department of Education was introduced in Plaintiff's prior litigation. Therefore, the existence or fact of the lawsuit against the Department is unnecessarily cumulative and likely to cause jury confusion if used to show Plaintiff's "knowledge" of the terminations or the "absence of mistake or accident" in failing to report the terminations. *See* (Def. Opp'n at 14); Fed. R. Evid. 404(b)(2) & 403.

Moreover, Defendant has offered no proof that Plaintiff's case, which proceeded to a bench trial, was fraudulently filed. Therefore, any potential probative value the suit might add to the contention that the allegations of discrimination are part of Plaintiff's *modus operandi* in these situations is substantially outweighed by the danger of unfair prejudice.[11]

---

[11] The cases Defendant cites in support of admitting the prior litigation are inapposite. *See Brewer v. Jones*, 222 F. App'x 69, 70 (2d Cir. 2007) (allowing admission of prior litigation "because the evidence was relevant to show a possible cause of [the plaintiff's] injury unrelated to the acts of the defendant"); *Hickey v. Myers*, No. 09 Civ. 1307 (MAD) (DEP), 2013 WL 2418252, at *3-4 (N.D.N.Y. June 3, 2013) (past litigation against a former employer allowed where employee "touted his earlier suit against [that employer] as part of his scheme to extort officials into retaining him in his [recent] position" and "threatened to sue his subordinates, those who encouraged participation in his evaluation, and threatened to sue those who were critical of his performance").

## ii. Termination from the Croton-Harmon Union Free School District, and Subsequent Correspondence with that District

### 1. The Unreported Termination

Plaintiff also failed to report her employment with and subsequent termination from the Croton-Harmon district on her application for a teaching position with the Defendant District. Defendant, therefore, plans to call as witnesses Barbara Ulm and Dr. Edward Furhman Jr. regarding Plaintiff's employment and termination from the Croton-Harmon district, and also seeks to introduce the Croton-Harmon district's February 22, 2010 resolution as evidence that Plaintiff was terminated from that position. (*See* Prop. Ex. G.)

The correspondence relating to Plaintiff's termination from the Croton-Harmon district at the time of that termination, of which Defendant was unaware, is unrelated and irrelevant to the issue of whether there was a discriminatory motive attached to the decision to terminate her. However, as with her termination from the New York City schools, her failure to indicate she had been terminated or denied tenure from the Croton-Harmon district, despite her recent termination from those schools, and moreover her omission of that employment from her resume entirely, are probative on the issue of her credibility. As above, however, at this point the introduction of extrinsic evidence demonstrating her termination is unnecessary. The Court will revisit this determination based on the testimony offered by Plaintiff at trial. Should Plaintiff contest whether she was terminated by her former employer, the Court may consider whether to allow Ms. Ulm to testify as to Plaintiff's termination.

### 2. Correspondence with Croton-Harmon After Her Termination from the Defendant District

Defendant argues Plaintiff cannot be allowed to use a post-termination statement (made in close proximity to her termination) to support her case while simultaneously seeking to exclude her own post-termination statements regarding her termination from the Croton-Harmon

school district (or her supposed desire to harm herself, discussed below). (Def. Opp'n at 1-2.) But the Defendant's statements, as alleged by Plaintiff, that allude to her national origin constitute circumstantial evidence that the decision to terminate her was based on prohibited discrimination, *see Altman*, 2014 WL 2809134, at *10-12, whereas *her* subsequent statements responding to the termination are irrelevant to the proffered reasoning underlying the decision to terminate her—her teaching performance. Thus, there is also no probative value to having any of the Croton-Harmon witnesses testify as to any of their interactions with Plaintiff occurring after her termination.

Additionally, Defendant argues that Plaintiff's post-termination correspondence with the Croton-Harmon District bears not only on her credibility, but also presents another potential motivating factor for her fabrication of the discriminatory statements. (*See* Def. Opp'n at 12 ("Plaintiff did not assert any allegations of discrimination until <u>after</u> the effective date of her termination had been accelerated. The correspondence with Croton shows how angry and upset the acceleration of her termination date made plaintiff.").) The evidence is probative as to Plaintiff's veracity since, despite the Croton-Harmon Board resolution terminating her employment, she has maintained that she resigned from the position. But this alleged motivation to fabricate the statements suffers from the same failings as Defendant's assertions regarding Plaintiff's threats to harm herself: it is too attenuated. Moreover, Defendant will be able to question Plaintiff about her assertions made at summary judgment, where she submitted an alleged copy of her resignation from Croton-Harmon, when probing her credibility in light of her representations on her application with the District.

Thus, whatever slight probative value the post-termination correspondence may have, introduction of such evidence is unnecessary, cumulative, confusing, and overly prejudicial—and it is excluded from trial.

### b. Evidence Related to Plaintiff's Threat of Suicide, the Police Response, Blogosphere Treatment, and Subsequent Defamation Lawsuit

#### i. The Suicide Threat

Plaintiff's reaction to the news of her termination is unrelated and irrelevant to the District's underlying decision-making process—completed prior to informing her of that decision. Defendant has consistently argued that Organisciak and Kolahifar never made the discriminatory comments Plaintiff alleges but nevertheless suggests that the suicide threats contextualize "the circumstances under which [they] allegedly made th[ose] comments[.]" (*See* Pl. Post Term. Reply at 3, ECF No. 121; Def. Opp'n at 11-12.) Defendant's argument is that, if they occurred, the alleged "racially tinged comments" were made at a meeting where the District was "armed with the knowledge that plaintiff had threatened to kill herself just days before[.]" (Def. Opp'n at 11.) Even if this argument in the alternative was persuasive, this action is not based on a failure to re-hire where such evidence might be relevant. *Cf. Gaffney v. Dep't of Info. Tech. & Telecommunications*, 579 F. Supp. 2d 455, 458 (S.D.N.Y. 2008) (alleged threat occurred before the adverse employment action, which was the defendants' failure to re-hire).

Here, the supposed suicide threat came days *after* the adverse employment action, the District's decision to terminate Plaintiff, and could not have affected that decision. Moreover, the Court can discern no legitimate reason, either on its own or from Defendant's opposition papers, why Organisciak and Kolahifar might have been prompted to make comments referencing Plaintiff's Chinese heritage because she had threatened suicide. Therefore, the

evidence would not negate any inference of discriminatory intent which may flow from those alleged comments should they be credited by the jury.

### ii.   The Police Response, Blog Postings, and Plaintiff's Statements to the Blogger

Given the irrelevance of the suicide threat, the items which followed, including the police report and the responding officer's testimony, the internet blog postings, and Plaintiff's follow-up correspondence with the author of the posts, will not aid the jury in its determination of whether the District's decision was based on Plaintiff's performance at the New Rochelle schools rather than discrimination.

### iii.   The Defamation Lawsuit

The jury in the resulting state defamation action brought by Plaintiff against the District, Organisciak, and Kolahifar concluded that the statements made by the Defendants—*i.e.* reporting the threat by Plaintiff to harm herself and noting her poor teaching performance—were true. (*See* Prop. Ex. FF.)  This determination, aside from also being irrelevant to the District's decision to terminate Plaintiff, would be particularly prejudicial and confuse the issues at trial.

Defendant's primary argument as to why the suicide threat, the blog posts, and the defamation suit are admissible to refute Plaintiff's version of events boils down to its assertion that Plaintiff was motivated by her outrage at the statements Mendez and Kolahifar made regarding her threats to harm herself, which she viewed as false and defamatory once made public, such that she invented the discriminatory statements now alleged in this case.  (Def. Opp'n at 11.)  As Defendant explains:

> [P]laintiff has testified that she had difficulty finding a job due to the blog posts which published her threats to kill herself (which a jury found to be true in dismissing her defamation case).  Further, as [P]laintiff wrote to the author of the blog asserting that the District had told her to go work in Chinatown and denied that she ever threatened to kill herself.  Clearly, the embarrassment and difficulty finding work gives [P]laintiff sufficient motive to lie as to what was

23

> said by the District, and the jury has every right to hear evidence that sheds light on the [P]laintiff's motivation for making her allegations of discrimination.

(*Id.* at 12 (citations omitted).)  The jury determination that the former individual defendants' statements reporting the threat were true is, thus, tenuously relevant at best, in that it might contradict Plaintiff's long-held contention that she did not make such statements, which then might impact her credibility.

Initially, it strains credulity to accept the premise that the suicide threat gave Plaintiff a motive to lie about statements made *after* her meeting with Mendez and Kolahifar at the subsequent meeting with Organisciak and Kolahifar.  It would be far more plausible, if at all, that she would have lied about statements made *when she was terminated* to justify the suicidal outburst.  But moreover, presentation of this alleged motive to fabricate the discriminatory statements would require a mini-trial on issues not before the Court, and beyond the scope of impeachment.  To allow impeachment of Plaintiff's credibility on this attenuated chain of reasoning would cause undue delay and confuse the issues in this case—and any relevance the defamation suit may have on Plaintiff's credibility is outweighed by the potential for prejudice.

In sum, none of the proposed evidence relating to Plaintiff's suicide threat on March 29, 2012 is probative of the events that took place on April 2, 2012.

### c.  Evidence of Plaintiff's Lawsuit Against the Rye YMCA

Plaintiff's complaint against Rye YMCA employees, alleging harassment and bullying, cannot possibly shed light on the District's decision making process, on the credibility of her assertion that the District discriminated against her, nor on her likelihood to fabricate those allegations as a reaction to her termination.  Her involvement in this unrelated case is improper character evidence.  "If such evidence were admitted, [P]laintiff would be forced to justify her [past] suit[s] . . ., as well as prove her case against [D]efendant."  *Byrne*, 2005 WL 1799213,

24

at *2.  This would unnecessarily confuse the issues at trial and the jury, and would carry a high risk of prejudicing the jury against Plaintiff by painting her as a chronic litigant.  Plaintiff's letter to Judge Preska in that case is similarly irrelevant.[12]

### d.  Evidence of the Metadata Associated with Plaintiff's Journal

Defendant contends that the metadata associated with Plaintiff's allegedly contemporaneous journal demonstrates it was created after the fact to add credence to her fabricated discriminatory statements.  (Def. Opp'n at 17 ("The metadata is clear evidence that [P]laintiff's 'journal' was not created when and in the manner she testified, but rather is a self-serving narrative created expressly for use during litigation against the District.").)  In support of that argument, Defendant points to the "Created" date of the electronic file, June 12, 2012, which is months after the first entry: March 26, 2012.  (*Id.*)  Plaintiff counters by noting that the "'Last Printed' date of '4/7/2012,' indicat[es] that the document was already in existence as early as April 2012, consistent with Ms. Altman's testimony."  (Pl. Metadata Reply at 2, ECF No. 122.)

The Court agrees with Plaintiff that the "Created" date found in the metadata "does not necessarily reflect the 'authoring date of a document, but . . . more accurately reflects the date the file was "created" within the file system of a particular device.'"  (*Id.* at 3 (quoting Craig D. Ball, *Ten Nerdy Things Lawyers Should Know About Electronic Evidence, Meeting the Challenge: E-mail in Civil Discovery*, American Law Institute, VCU0712 ALI-CLE 1 (July 12, 2012).)  Moreover, the battle of the metadata between Defendant and Plaintiff, without more

---

[12] The Court also notes that although Defendant interprets this letter as a veiled suicide threat, Plaintiff's suit against the Rye YMCA targeted alleged bullying.  Thus, Plaintiff may have hoped her lawsuit would help avoid "tragedies" *in general* rather than any tragedy specific to herself.  *See* Kathleen Conn, *Best Practices in Bullying Prevention: One Size Does Not Fit All*, 22 Temp. Pol. & Civ. Rts. L. Rev. 393, 421 (Spr. 2013) (discussing, for example, "state anti-bullying laws [] passed in response to student suicides" and noting the need for comprehensive bullying reform); *id.* at n.1 (citing David C. Yamada, *The Phenomenon of "Workplace Bullying" and the Need for Status-Blind Hostile Work Environment Protection*, 88 Geo. L.J. 475 (2000)).

information, is unlikely to positively or negatively impact Plaintiff's credibility—but it is significantly likely to lead to juror confusion and cause undue delay.  Defendant's own confusion reinforces this conclusion.  (*See* Def. Opp'n at 19 ("the document was apparently created in a single sitting to accompany the Plaintiff's Notice of Claim").)

Plaintiff is available to testify live at trial and has not indicated a plan to introduce the journal.  Therefore, unless Plaintiff attempts to use the journal to bolster her case, there is no permissible use of the journal's metadata at trial.

### e.  Evidence of Plaintiff's Post-termination Statements and Communications with the District or Her Union

These post-termination statements are similarly irrelevant to the District's decision, and would not shed any light on Plaintiff's performance while teaching in the New Rochelle schools. The District, however, also seeks to impeach Plaintiff, or question the credibility of her accusations of discrimination, on the basis that she "made several complaints regarding the decision to terminate her employment in which she did not allege racial discrimination."  (Def. Opp'n at 9.)  This includes statements made to her union representative on April 2, 2012 after the meeting with Organisciak and Kolahifar, correspondence with the District's board from April 25, 2012 requesting her reinstatement, and her notice of claim dated June 14, 2012—none of which explicitly referenced national origin discrimination.  Defendant's cite *Dean v. N.Y. Marriott Fin. Ctr. Hotel*, No. 94 Civ. 4343 (TPG), 1998 WL 574382, at *5 (S.D.N.Y. Sept. 8, 1998), for the broad proposition that "it is well-established that evidence of statements made after an adverse action can be relevant to determining the circumstances surrounding the action."  (*See* Def. Opp'n at 9.)  But *Dean* only reiterates the unremarkable rule that business records, even those made after the precise date an employee is terminated, are admissible as evidence.  *Dean*, 1998 WL 574382, at *5 (citing Fed. R. Evid. 803(6) (the "record of an act" is admissible if, as relevant

there, the records was "made at or near the time" of the act or "kept in the course of [the] regularly conducted activity of [the] business").

Defendant's interpretation of Plaintiff's silence is that she did not invent the false story of discrimination until she created (or fabricated) her journal.  (*See supra* admissibility of metadata.)  Yet notably, some of this proffered evidence contradicts Defendant's position.  For example, Plaintiff's union representative, who testified that she did not make such accusations when she spoke with him right after the meeting, recalls she began making such allegations in late May, even though the mid-June notice of claim does not allege such discrimination.  (*See* Def. Opp'n at 3-4, 9-10, 19.)  Similarly, the journal, which Defendant's seek to portray as a fabrication created for this litigation, contains the "racially tinged" statements that are arguably absent from the notice of claim filed two days later.

Nevertheless, despite these inconsistencies in Defendant's theory, Defendant may use this evidence—the absence of contemporaneous complaints, much of which was authored by Plaintiff—to support the inference that the allegations were created *post-hoc*.  For example, it is probative to Plaintiff's credibility, and not overly prejudicial, that she did not discuss the discrimination during her conversation with her union representative right after the meeting where the statements allegedly occurred.  *See, e.g.*, *Waters v. Genesis Health Ventures, Inc.*, No. 03 Civ. 2909, 2005 WL 1279125, at *5 n.3 (E.D. Pa. May 25, 2005); *Hughes v. Indianapolis Radio License Co.*, No. 07 Civ. 0081 (WTL) (TAB), 2009 WL 226209, at *1 (S.D. Ind. Jan. 30, 2009) ("The fact that she did not complain to anyone about this discrimination while it was happening is relevant to her credibility regarding her view of the incidents and treatment in question."); Fed. R. Evid. 801(d)(2)(A) advisory committee's note (a "party's own statement is the classic example of an admission" and is not considered hearsay).  "Plaintiff will be able to

testify regarding her reasons for choosing not to complain, and the jury will be able to weigh that testimony in arriving at its credibility determination." *Hughes*, 2009 WL 226209, at *1.

Therefore, Plaintiff's letter to the District's board and the notice of claim are admissible to support the inference that plaintiff fabricated the existence of the alleged discriminatory statements after the April 2, 2012 meeting.  (*See* Prop. Ex. A (the Notice of Claim), Ex. AA (the April 25th letter from plaintiff to the District's board).)  Testimony from the union president, Mr. Daly, who Plaintiff also intends to call as a witness is also admissible on this point.  Fed. R. Evid. 801(d)(2)(A) (opposing party's statements admitted against that party are not hearsay).

## III.    Damages Evidence & Trial Bifurcation

Plaintiff's effective date of termination was advanced by one-month—to June 1, 2012 instead of June 30, 2012—purportedly due to Plaintiff's termination from her unreported job with the Croton-Harmon School District, as evidenced by minutes of a Croton-Harmon District board meeting showing Plaintiff was terminated.  On summary judgment, Plaintiff countered with a copy of her letter of resignation dated the same day.  Plaintiff testified that she in fact resigned from the position because the other Chinese teacher was uncooperative.  Organisciak also reported Plaintiff's failure to include the Croton-Harmon job on her application and resume to the State Education Department Teacher Discipline Unit.  Defendant plans to offer this evidence on the issue of damages, specifically as to the amount of back-pay Plaintiff would be entitled to should she prevail.

Plaintiff seeks to bifurcate the trial into a liability and general damages phase followed by a back-pay damages phase to avoid any prejudice that might result from Defendant's arguments surrounding Plaintiff's failure to report her previous terminations when she applied for the job

with the District—which Plaintiff argues is only relevant to the issue of back-pay.  (*See* Mot. to

Bifurcate, ECF No. 110; Pl. Bifurcation Mem. at 1-2.)

### a.  Legal Standard

Bifurcation allows a court to separate portions of a trial, for example the liability and

damages phases, in order to promote the interests of "convenience, negation of prejudice, and

judicial efficiency."  *Vichare v. AMBAC Inc.*, 106 F.3d 457, 466 (2d Cir. 1996) (citing Fed. R.

Civ. P. 42(b)).  Theoretically, a trial could proceed on the issue of liability and terminate should

the jury find in favor of the defendant—without ever having to present any evidence relating to

damages.  Similarly, if the damages evidence is particularly inflammatory, then it may be

advisable to bifurcate so that the jury's determination on liability is not clouded by such

unrelated evidence.

Nevertheless, bifurcation "is a procedural device to be employed only in exceptional

circumstances."  *Marisol v. Giuliani*, 929 F. Supp. 662, 693 (S.D.N.Y. 1996).  "[T]he party

seeking bifurcation shoulders the heavy burden of establishing that bifurcation is warranted."  *In

re Lehman Bros. Holdings, Inc.*, No. 10 Civ. 6200 (RMB) (FM), 2011 WL 2651812, at *1

(S.D.N.Y. June 22, 2011); *Miller v. Am. Bonding Co.*, 257 U.S. 304, 308 (1921) ("In actions at

law the general practice is to try all the issues in a case at one time; and it is only in exceptional

instances where there are special and persuasive reasons for departing from this practice that

distinct causes of action asserted in the same case may be made the subjects of separate trials.");

*Kos Pharm., Inc. v. Barr Labs., Inc.*, 218 F.R.D. 387, 391 (S.D.N.Y. 2003).  "Bifurcation may []

be appropriate where the evidence offered on two different issues will be wholly distinct," but

where "the issues of liability and damages are intertwined," separating those phases is unlikely to

promote the primary interests bifurcation is designed to serve.  *See Vichare*, 106 F.3d at 466-67.

### b. Admissibility of the Evidence and Analysis of Plaintiff's Bifurcation Argument

"After-acquired evidence" can be admitted for this purpose:

> An employer's discovery, after its discriminatory or retaliatory
> discharge of an employee, that the employee had engaged in conduct
> that would have led to a lawful discharge if the employer had been
> aware of that conduct, may limit the employee's backpay award to
> the period between the unlawful termination and the date on which
> the discovery was actually made.

*Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 696 (2d Cir. 1998); *see also McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362-63 (1995).  Indeed, the evidence of Plaintiff's termination from the Croton-Harmon schools is also admissible to impeach Plaintiff's credibility, as discussed above.  Therefore, whatever evidence on this point Defendant chooses to offer on cross-examination will similarly serve as evidence for damages purposes.  Nothing additional beyond the fact that she was terminated from the position and failed to report the job on her employment application is required, and anything more would be unnecessarily cumulative— aside from evidence not at issue in these motions relating to the likely impact to Plaintiff's employment with the District after making such a discovery.

This disposes of Plaintiff's bifurcation argument, as well, since the evidence Plaintiff argued might cause unfair prejudice is admissible as to her credibility during the liability determinations at trial.[13]  (*See* Pl. Bifurcation Mem. at 4-5) ("Allowing the District to try to paint Ms. Altman as a 'liar' using after-acquired evidence having no relevance to the core issue of the case risks confusing the jury and prejudicing Ms. Altman.")  While not as extreme as the situation in *Vichare*, the evidence supporting Plaintiff's liability case and damages case are also

---

[13] There is no need for a limiting instruction on this evidence since it is admissible and probative on multiple issues.

sufficiently intertwined to militate against bifurcation.  *See Vichare*, 106 F.3d at 466; *see also* (Def. Opp'n at 1 ("Further, bifurcation will cause delays [and] additional expense")).

*   *   *

Therefore, the following exhibits subject to the motions *in limine* are excluded from trial: 3-4, B-F, H-J, X, CC-FF, MMM-VVV, XXX-ZZZ, BBBB-LLLL, and NNNN.  Additionally, the following exhibits are also excluded unless Plaintiff opens the door to their admission, a matter which the Court will determine as trial progresses: G and KKK.  Live witness testimony is preferred to deposition testimony, though Plaintiff's deposition testimony is certainly admissible for impeachment purposes.  Based on the rulings above, it does not appear that any of Defendant's proffered deposition testimony is required, but should a witness be unavailable and the testimony be otherwise admissible in accordance with these rulings, then the Court will consider admitting the testimony at that time.

<h2 style="text-align:center">CONCLUSION</h2>

For the foregoing reasons, Plaintiff's motions *in limine* are GRANTED in part and DENIED in part.  Plaintiff's motion to bifurcate the trial proceedings is DENIED.  The Court respectfully directs the Clerk to terminate the motions at ECF Nos. 101, 103, 105, 107, and 110. The parties are directed to appear at the previously scheduled final pretrial conference on January 20, 2017 at 11:00 a.m.

Dated:   January 6, 2017
            White Plains, New York

SO ORDERED:

NELSON S. ROMÁN
United States District Judge